MARY ROSE SMITH, PLAINTIFF-RESPONDENT, v. THE
NATIONAL COMMERCIAL TITLE AND MORTGAGE
GUARANTY COMPANY, DEFENDANT-APPELLANT.

Argued October 20, 1937—Decided March 31, 1938.

For the plaintiff-respondent, *Spaulding Frazer, David
Stoffer* and *Harold H. Fisher.*

For the defendant-appellant, *Lindabury, Steelman, Zink
& Lafferty (James L. R. Lafferty).*

The opinion of the court was delivered by

CASE, J. Defendant is a New Jersey corporation engaged in the business of investing in bonds and mortgages secured by real estate and in selling and guaranteeing such securities as well as shares and certificates of participation therein. Plaintiff purchased the defendant's guaranteed mortgage bond in the amount of $20,000 bearing interest at the rate of five and one-half per centum per annum, now evidenced by a participation certificate. The principal became due July 1st, 1936, all of which, with some accumulation of interest, remains unpaid; and this suit is to recover the debt. Defendant filed an answer which, on plaintiff's motion, was struck. Judgment for plaintiff was entered in the amount of principal, interest and costs. Defendant appeals. Such of the facts as appear to have weight will be stated in the body of the opinion.

The gist of the factual presentation set up in the answer is that defendant was organized under the "Insurance Companies" act, chapter 134, *Pamph. L.* 1902, and was and remained under the supervision and control of the commissioner of banking and insurance; that on March 6th, 1933, until which time defendant paid its obligations as they accrued, defendant suspended operations because of the "interpretation" given to the presidential proclamation suspending the business of banking and was not able thereafter to pay its then existing obligations without great loss and hardship to debtors and stockholders and without unfavorable effect upon the investing public and the market for real estate; that on March 21st, 1933, the commissioner of banking and insurance, acting under authority of chapter 71, *Pamph. L.* 1933, issued his General Order No. 1 which, amongst other provisions, suspended payment of interest and principal due to holders of guaranteed mortgages and interests in mortgages and the redemption or repurchase thereof by mortgage guaranty companies, except under certain named conditions which do not here apply; that on January 10th, 1934, pursuant to that order, defendant submitted to the owners and holders, including the plaintiff, of its obligations a plan of operation;

that by May 27th, 1935, the requisite number of investors had approved, and that on that day the commissioner approved, the adoption of the plan; that on June 20th, 1935, defendant notified the holders of its obligations, including the plaintiff, of the adoption; that on September 15th, 1936, a further order was made by the commissioner; and that, beginning March 6th, 1933, defendant has continuously conducted its business in accordance with the aforesaid proclamation, statutes, orders and plan. Except as those allegations of fact assume a conclusion of law they may be taken to be true. The court below treated plaintiff's motion to strike as in essence a general demurrer to the answer as to conceded facts, and while there were charges that parts of the answer were false and depositions were taken by both sides, the court below thought, and we think, that the factual differences do not go to the heart of the case.

The defenses which deserve our attention are, first. that chapter 71, *Pamph. L.* 1933, together with the action thereunder of the defendant in adopting the plan and of the statutorily requisite number of investors and of the commissioner in approving the same, limits plaintiff to such remedies for recovery as are within the provisions of the plan, and, second, that the plaintiff is estopped to deny that she has consented to, or is subject to the effect of, the plan and that she has waived her right to payments except as modified by the plan. We shall assume, for the purposes of the argument, but we do not decide, that the legislature had power to enact the statute and that the plan was within the scope of the statute.

The plan provides in part that interest payments for a period of five years after the effective date are to be at the rate of three per centum per annum instead of the contract rate of five and one-half per centum; that the remaining two and one-half per centum is to be credited together with interest in arrears at the effective date and is to be paid ratably out of collected income, if possible, and at the end of the five-year period a certificate of indebtedness is to be issued for any interest then remaining unpaid to "be payable, with-

out interest, ratably in one payment or installments, at the call of the company;" and that payments of principal are extended for a period of five years beyond the date specified in the contract. Therefore, if the plan be binding, payment of the plaintiff's guaranteed certificate is deferred from July 1st, 1936, to July 1st, 1941, the interest payments are, in part at least, deferred and the ultimate payment of the interest is left in doubt.

The statutory authority (chapter 71, *Pamph. L.* 1933, § 2(e)) is that "The Commissioner of Banking and Insurance shall have power * * * with the consent of the respective holders of not less than two-thirds of the face amount of shares or parts of mortgages or mortgage participation certificates * * * to authorize or require the alteration or amendment or waiver of any of the terms and provisions of the same, or of the mortgage or trust mortgages or indentures securing the same * * * in which such holders are respectively interested." These excerpts demonstrate the importance of, and the necessity for, affirmative action on the plan by the commissioner. The plan has no status unless and to the extent that the commissioner approves. The commissioner's order of May 27th, 1935, was a special order directed exclusively towards the defendant's plan. In addition to the formal approval it contained this provision:

"It is further ordered and directed that all guaranteed mortgages and interests in mortgages not made subject to said plan under the consents heretofore received or that may hereafter be received shall continue subject in all respects to General Order No. 1 as issued by the Commissioner of Banking and Insurance under date of March 21st, 1933, and all other general regulations supplemental thereto or amendatory thereof."

Sharp difference arises between the parties on the identification of the mortgages and interests in mortgages which the approval directs shall remain subject to General Order No. 1. Construction must be given to the wording of the approval because it is, in effect, a part of the plan. Plaintiff contends that it is to be understood as a direction that those, like her-

self, who did not consent remained outside the plan and subject at that time to General Order No. 1. Having in mind that the validating consents necessary to the adoption of the plan had been received and were a part of the structure upon which the approval was grounded, we incline to think that the approval, on its face, carries that implication, but sufficient doubt exists to justify extraneous study. If the language of a written instrument is indefinite and ambiguous, the construction put thereon by the parties themselves will ordinarily govern provided the language will reasonably permit of such construction. *Albert* v. *Ford Motor Co.*, 112 *N. J. L.* 597; *Thomsen* v. *Riedel*, 114 *Id.* 379. The construction given by the defendant, draftsman, proponent and sponsor of the plan and party to all of the instruments involved therewith, may be resorted to.

The plan became effective with the approval of the commissioner May 27th, 1935. The next interest date thereafter was July 1st, 1935. By the terms of the plan interest was to be paid on that day or within sixty days thereafter; and so with respect to each succeeding interest date. No interest payment was made to the plaintiff on that day or thereafter until the event next mentioned. On November 19th, 1935, the defendant company, by its president, wrote plaintiff as follows (the italization in this and in the two succeeding letters is inserted):

"Dear Madam:

According to our records, you are the holder of $20,000 Mortgage Participation Certificates in our Series A. G.

We are now operating under a Plan approved by the Commissioner of Banking and Insurance, under which we are paying on account interest at the rate of 3% per annum, and *an interest payment was due on your certificates July 1st.* Check is in the possession of Federal Trust Company for delivery to you upon presentation of your Certificates for endorsement.

*If you do not intend to join in the Plan* by presenting your Certificate for endorsement, *and you will so advise, we will so note our records and I will immediately obtain the check from Federal Trust Company and forward it to you.*

I enclose stamped envelope for reply."

To that letter plaintiff replied under date of December 6th, 1935, as follows:

"I have your letter of November 19, 1935, and wish to say that *it is my present intention not to join in the plan* submitted, and, therefore, as you wrote me, I would appreciate it if you would obtain the check from the Federal Trust Company and forward it to me."

On December 9th, 1935, defendant sent plaintiff her interest check that had obviously been held since July 1st, 1935, awaiting her decision, and with the check sent a letter, written by its president, stating:

"Dear Madam:

I have your note regarding $20,000 Series A. G. Participation Certificates which you hold. .I have noticed on our records that you do not care to join the Plan and have obtained interest check from Federal Trust Company, Trustee, which I enclose herewith. The next interest check, which will be due January 1st, will be mailed to you promptly.

*We trust we may have your co-operation in our effort to work out this situation, even though you do not join the Plan. If you should later conclude to join, we will appreciate it."*

The January 1st, 1936, interest payment was, as promised, sent promptly.

Clearly the defendant company gave to the plan the construction for which plaintiff contends, namely, that she was not bound thereby. We think, too, as we have already indicated, that the language in the commissioner's order of approval reasonably admits of that construction. We find accordingly.

We conclude that the plan did not bring within its application those who did not consent, and that by the terms of the statute and of the order plaintiff, as a dissenter, remained subject to General Order No. 1 of March 21st, 1933, and to other general orders and regulations supplemental thereto or amendatory thereof in so far as the same conformed to the authorizing legislation. But it does not follow that plaintiff, at the institution of this suit, was still under the ban of such departmental restraint.

There was no legislative authority except as it be found in the original or amended provisions of the 1933 statute. The statute was enacted as emergency legislation. That is clear. Further, in our view, the legislature fixed the date upon which the emergency powers under it should lapse. It provided in section 14 of the 1933 statute:

"14. This act shall become inoperative after three years from the date of its approval, but all orders or regulations made and all acts and things done under the provisions of this act shall be and remain valid and operative."

In 1936, by chapter 19 of *Pamph. L., p.* 30, § 14, was amended to read thus:

"14. This act shall become inoperative after three years and six months from the date of its approval but no company shall be entitled to the benefits of this act which shall not have, prior to three years from the date of its approval filed some plan with the Commissioner of Banking and Insurance which shall have received his approval. All orders or regulations made and all acts and things done under the provisions of this act shall be and remain valid and operative."

The date of the approval of the original enactment was March 16th, 1933. Three years and six months from that date was September 16th, 1936, and that, in our opinion, was the decreed end of the emergency then under consideration. If the legislature enacts a statute clearly purposed to meet an emergency, and therein determines the time limit of the emergency and of the life of the statute, it is not for the courts to extend that period.

This leads to the inquiry whether the final sentence of section 14 directs that an order or a regulation promulgated by the commissioner during the period of emergency shall in the absence of a pertinent provision in the readjustment plan made by the holders and the company, remain unabated after the emergency has passed, however much the order or regulation may conflict with existing contracts or impair rights and remedies. If the answer be in the affirmative, the issue is seriously involved with constitutional entanglements. An alternative construction is that acts done during the emer-

gency under the authority of the statute and of an appropriate order shall retain their validity and particularly that a plan duly adopted and approved during the emergency shall remain efficacious after the emergency has passed. To resolve the doubt thus engendered we resort to the preamble or recitals for the purpose of ascertaining the legislative intent. *Brown* v. *Erie Railroad Co.*, 87 *N. J. L.* 487, 490.

The 1933 statute contains a preamble, consisting of four "whereas" clauses, the first of which recites that a public emergency exists; the second that

"It is essential * * * that the liquidation of mortgage investments be conducted in an orderly manner, that opportunity be afforded for the readjustment of mortgages to meet changed conditions and that this opportunity be extended beyond the period of disturbed banking and financial conditions, and continue during the operation of normal recuperative economic processes."

The third that assets securing guaranteed mortgage investments should be held, administered and conserved in the ratable and equitable interest of the holders; and the fourth that "for the effectuation of those ends it is necessary * * * that such holders * * * and such mortgage guaranty companies be empowered, under regulation by the Commissioner * * * to make readjustments and to take all steps appropriate thereto; therefore"—and then follows the enactment. The first clause states the emergency which is the occasion for the legislation, the second and third clauses state the ends sought to be reached, and the fourth clause states the means to those ends, namely, an authority to the holders and the company to readjust their contractual relations under regulation by the commissioner. That means, as we understand, that the primary legislative purpose was to permit the holders and the company, under regulation by the commissioner, to formulate and adopt a plan which would have effect not only during the emergency but beyond that and into the period of recovery. Section 14 should be read in the light of the preamble and with due regard for the fact that extraordinary powers, consistent only with the chaos of a wide-

flung emergency, were conferred upon the commissioner. It is our opinion that the legislature did not intend to endow the commissioner with authority to set up, within the period of an emergency, a program, which, after the lapse of that period, should prevent dissenting parties from enforcing lawful private contracts made prior to the adoption of the orders, rules and regulations and to the enactment of authorizing legislation. Inasmuch as this action was begun November 4th, 1936, after the lapse of the emergency period, the matters sued upon were beyond limitation and restraint by the commissioner.

The defenses of estoppel and waiver are separately pleaded in the answer; properly so, because strictly, they have distinctive significance. *Central Railroad Co.* v. *MacCartney,* 68 *N. J. L.* 165, a Supreme Court decision approved by this court on many occasions (*Briscoe* v. *O'Connor,* 119 *N. J. Eq.* 378; *Stammelman* v. *Interstate Co.,* 112 *N. J. L.* 342), states the doctrine of estoppel as applied in this state, and *Crawford* v. *Winterbottom,* 88 *Id.* 588 (overruled in its application of the law to the case, *Freeman* v. *Conover,* 95 *Id.* 89; cited favorably on the availability of estoppel at law, *Basen* v. *Clinton Trust Co., infra*), clarifies the distinctive character of waiver. One of the essential elements of estoppel is that the party who seeks the benefit of it must have relied upon the representations or conduct of the other party and thereby have been led into such a course of conduct that he will now be substantially prejudiced if the other party be permitted to repudiate his former action or representation. Waiver is a designation of the act, or of consequences of the act, of one side only, and it refers to an intentional abandonment or relinquishment of a known right. Defendant's brief does not observe the distinction drawn in its pleading but treats the matter under this single subheading:

"Plaintiff is not entitled to judgment because by accepting the benefits of the plan she elected to be bound thereby and waived her right to question the validity and the constitutionality of the statute upon which it rests, notwithstanding

plaintiff's expressed objection to the plan and regardless of the constitutionality of the statute and administrative orders."

That appears to present the defense of waiver, but the only New Jersey citation is *Basen* v. *Clinton Trust Co.*, 115 *N. J. L.* 546, which went on the specific and exclusive ground of estoppel. In the last analysis the acts of the plaintiff upon which the argument rests consists of the acceptance and use of three interest checks presently to be mentioned.

On January 10th, 1934, defendant circulated its proposed plan. On May 27th, 1935, the required number of investors had approved and the commissioner gave his approval. Until then the defendant had done nothing by which either estoppel or waiver could be claimed against her. She had not approved; she never approved. On the contrary, she wrote to the defendant acknowledging receipt of the proposed plan but making inquiry on ten specific points and significantly refraining from making any commitment as to acceptance. The three interest checks referred to above were all drawn to the order of plaintiff, sent to her and banked by her, each in the amount of $300 dated July 1st, 1935, January 1st, 1936, and July 1st, 1936, respectively, and each bearing on its face this notation:

"In payment on account of interest on mortgage certificates of A. G. Series, registered in your name on the above date. Payment hereby is pursuant to Plan of Operation submitted January 10th, 1934, approved by the Commissioner of Banking and Insurance of the State of New Jersey, by Order dated May 27th, 1935, effective July 1st, 1935."

The surrounding circumstances are such, in our opinion, that the checks fail of the force imputed to them. Since the 1933 bank holiday and before the adoption of the plan plaintiff had regularly been receiving each January 1st and July 1st an interest check in the amount of $165. The checks first above mentioned were for $300 each but were less, even as the earlier checks had been less, than the amount to which plaintiff, by the terms of her security, was entitled. Plaintiff did not have knowledge and was not on notice that the relatively small sum of money, a fraction of the accrued interest, which was paid to her was what the Basen case called "the

fruits of the reorganization." The checks were forwarded to plaintiff with full knowledge of her dissent, and with no misunderstanding as to her position. The acceptance by her of the remittances had no misleading affect upon defendant's subsequent course. The first of the $300 checks, although dated July 1st, 1935, was not sent until a much later date and was prefaced by the exchange of correspondence detailed above. We find neither estoppel, acceptance of the plan, election nor waiver.

Plaintiff's contract provided that at the holder's option the coupon certificate might be surrendered in exchange for a registered certificate without coupons. On or about April 12th, 1933, plaintiff, on defendant's suggestion that payment of the interest by check rather than on coupon would be the more convenient method, made the exchange. We find nothing in that circumstance pertinent to the issue on this appeal.

The answer does not set up a valid defense. It was properly struck.

The judgment below will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, CASE, BODINE, DONGES, HEHER, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 10.

*For reversal*—PERSKIE, J. 1.